Chief Judge Fuld.
An administrative agency is, of course, the sole arbiter of issues of fact but the questions posed by this appeal are, first, whether the findings made by the State Liquor Authority are, “ on the entire record, ” supported by substantial evidence (see, e.g., Matter of Holland v. Edwards, 307 N. Y. 38, 44; Matter of Kopec v. Buffalo Brake Beam, 304 N. Y. 65, 71-72; Matter of McCormack v. National City Bank, 303 N. Y. 5, 9), and, second, whether, if some of the Authority’s findings are sufficiently supported, the facts found justified its conclusion that there had been a violation of the Alcoholic Beverage Control Law.
The Playboy Club, a large and well-known night spot in New York City, was given a 15-day suspension of its license — of which 5 were deferred — as a result of a single incident in which one of its customers was assertedly assaulted by an employee.[1] The club brought this article 78 proceeding against the Authority, seeking an annulment of its determination on the grounds, principally, that (1) the record does not contain substantial evidence that it “ suffered or permitted [the] premises to become disorderly ’ ’ (Alcoholic Beverage Control Law, § 106, subd. 6) and (2) that it was denied a fair hearing when it was not allowed to examine the prehearing statement of the Authority’s main witness.
*548 The incident occurred on a night in February of 1966, when Michael Kendall, a patron of the club, engaged in a dispute with the club’s coatroom girl over a lost or missing check stub. Mr. Kendall, who admittedly had been drinking heavily, became loud and boisterous and, as the hearing examiner expressly found, blocked the way of other patrons seeking to deposit or receive their garments. After several minutes, the girl signaled to another employee of the club, Bruce Graziano, who led Kendall to a service entrance, off the main premises and out of public view, where he asked the customer to leave the club. Kendall refused, and Graziano grabbed him and sought to push him toward a wall. It was Kendall’s story—which the Authority apparently credited — that he fell to his knees, arose, made a fist, drew back his arm preparatory to striking Graziano when, as he was deterred from doing so by two other men who held his arm from behind, Graziano “ threw a punch ” at him which landed on his eye. He was immediately released and given a piece of meat to apply to the injured eye.[2]
On the basis of this evidence, the Authority’s hearing examiner concluded that the Alcoholic Beverage Control Law had been violated in three respects: (1) by the removal of Kendall to a remote portion of the premises as a prelude to ejecting him; (2) by Graziano’s striking him while he was helpless and posed “ no threat and (3) by the club’s failure to call the *549 police to remove Kendall. It is highly significant, we suggest, that the hearing examiner refrained from finding that Kendall was behaving properly or that the club was not justified in seeking to eject him.
Applying settled principles to the case before us (see, e.g., Matter of Kopec v. Buffalo Brake Beam, 304 N. Y. 65, 71-72, supra; Matter of McCormack v. National City Bank, 303 N. Y. 5, 9, supra), it is clear that the determination that the club “ suffered or permitted [the] premises to become disorderly ” — within the sense of subdivision 6 of section 106—cannot stand. There is just no warrant for the Authority’s conclusion that the statute was violated. Indeed, if the attempt by Graziano to remove Kendall was to be deemed a violation of subdivision 6, a licensee, faced with an unruly and recalcitrant patron, would find himself on the horns of a serious dilemma. It may not be disputed that Kendall had been drinking heavily, that he had behaved in a loud and belligerent manner and that he had prevented other customers from getting to the coatroom. The club was not required to tolerate such conduct. On the contrary, to have allowed it to continue would have been to suffer or permit the very disorder prohibited by the statute.
This is borne out by the fact that the Authority had, some time before, expressly advised the club that it was authorized to use ‘ ‘ reasonable force to maintain order or to eject unruly patrons ” — though it, of course, added that the use of “ undue force ” would violate the statute. In view of this stated policy of the Authority, we find it impossible to justify the finding that the club’s only recourse was to call the police. The removal of Kendall from the area of the club’s busy coatroom to a service area which was not open to the public was entirely consistent with the maintenance of order on the premises, particularly since the main entrance was small, crowded, heavily traveled and clearly visible from the street. The suspension could only be sustained, therefore, if it was shown that the management suffered the use of “undue force ” by Graziano.
Even Kendall’s version of what occurred negates the finding that undue force had been employed in dealing with him. As our recital above demonstrates (supra, p. 548), his own testimony establishes that Graziano’s blow was struck in self-defense after Kendall himself, intending to hit Graziano, had *550 drawn “ [his] fist back to strike ” him, and there is no evidence to the contrary. When an unruly patron, who refuses to leave the premises, threatens an employee with an upraised fist, a single punch, thrown to counter the anticipated blow, does not render the premises disorderly. Even if we were to assume that there was support for a finding that the force used was excessive, there was no basis in law for holding the club responsible for such a single isolated act by its employee, an act which manifestly occurred on the spur of the moment.
Although it is not necessary to find a “foreseeable pattern of conduct ’ ’ where the disorder is initiated by an employee left in charge of the premises (see Matter of Club 95 v. New York State Liq. Auth., 23 N Y 2d 784), a licensee cannot possibly control — and, hence, is not to be held responsible for •—every single act of all persons in his employ. (See, e.g., Matter of Missouri Realty Cory. v. New York State Liq. Auth., 22 N Y 2d 233.) It is still the rule, as this court recently reaffirmed in the Missouri Realty case (22 N Y 2d, at p. 237), that conduct is not “suffered or permitted” unless “‘the licensee or his manager knew or should have known ’ ” of the asserted disorderly condition on the premises and tolerated its existence. (See, also, Matter of Migliaccio v. O’Connell, 307 N. Y. 566, 569.)
In the present case, there is no showing of a similar occurrence by this or any other employee that the manager in charge participated in or sanctioned the employee’s conduct or that he was even aware of it until it was too late. In view of the complete absence of evidence that any person in authority in the club actually ‘ ‘ suffered or permitted ’ ’ the incident to take place, or could possibly have anticipated it, there was no basis in fact or law for a finding or conclusion that section 106 had been violated.
In the view thus taken, we neither reach nor consider the club’s further contention that it was error to deny its request to examine, for purposes of' cross-examination, a statement prepared for the Authority by Kendall and used by him, prior to testifying at the hearing, to refresh his recollection.
The order appealed from should be reversed, with costs, and the determination of the State Liquor Authority annulled.

. The club claims, and it is not disputed, that the cost of this penalty, in lost profits and overhead expenses, will exceed $50,000.

. This is Kendall’s testimony on direct examination:
“ I got up and at this point I threw my coat off and I pulled my arm back like this (indicating). It was about this level (indicating) and it was grabbed.
• ** . *
“ Mr. Pollack: Let the record indicate that the witness said he drew his arm back as if to strike.
“The Witness: Yes, please.
“Mr. Rosenstein: Can you indicate for the record Commissioner, what the witness is doing?
“ Comm. Myers: The witness has testified that he drew his arm back to shoulder level and his hand was in the form of a fist.
“ The Witness: That’s right.
“ Q. What happened then? A. Well, at that point my both arms were grabbed from behind and Mr. Grazzino [sic] just threw a punch at me.”
And, on cross-examination, he stated:
“ Q. Did you draw your fist back to strike Grazzino [sic]. A. Of course I did.
“ Q. That was your intention wasn’t it? A. Yes, I testified to that.”